**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:05cr154 (MRK) |
| | : | |
| ELIE NAKOUZI, & | : | |
| DR. JUAN FICA | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION**

Defendants, Dr. Juan Fica and Elie Nakouzi, are charged in a Superseding Indictment [doc. #13] (the "Indictment") with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, and nine counts of health care fraud in violation of 18 U.S.C. § 1347. Currently pending before the Court is Defendants' motion to suppress evidence obtained by the Government pursuant to a search warrant executed at Dr. Fica's medical office, as well as their request for a *Franks* hearing on their motion to suppress. *See* Defendant Fica's Motion for the Court to Rule, in Part, on its Motion to Suppress [doc. #21] (requesting that the Court schedule a *Franks* hearing); Defendant Fica's Motion to Suppress [doc. #22]; Defendant Nakouzi's Motion to Adopt Motions of Co-Defendant [doc. #41]. In addition, Defendants have also moved to dismiss the Indictment. *See* Defendant Fica's Motion to Dismiss Indictment [doc. #35]; Defendant Nakouzi's Motion to Adopt Motions of Co-Defendant [doc. #41]. As explained below, the Court denies Defendants' request for a *Franks* hearing as well as their motions to suppress and to dismiss the Indictment.

**I.**

**The Charges.** The Indictment alleges that Dr. Fica, who operates a medical practice in

Waterbury, Connecticut, hired Mr. Nakouzi in or about July 1996. According to the Indictment, Mr. Nakouzi has a medical degree from a medical school in Grenada, West Indies, but has repeatedly failed to pass the examination offered by the Educational Commission for Foreign Medical Graduates, which is a prerequisite for licensure in many jurisdictions in the United States. At all relevant times, Mr. Nakouzi was not licensed to practice medicine in any capacity in Connecticut – that is, he was not a licensed physician, physician's assistant, registered nurse, advanced practice registered nurse, nurse practitioner, or licensed practical nurse.  Indictment ¶ 7.

The Indictment alleges that from July 1996 until on or about January 30, 2003, Dr. Fica and Mr. Nakouzi conspired to defraud health care benefit programs by billing under Dr. Fica's name office visits that "were rendered in whole or in part by Nakouzi." *Id.* ¶ 12. The Indictment charges that while Mr. Nakouzi was employed by Dr. Fica, Mr. Nakouzi would "see and treat Fica's patients as if Nakouzi held a medical license" and would "conduct[] the office visit in whole or substantial part, as if Nakouzi held a medical license." *Id.* ¶ 15. The Indictment also alleges that Dr. Fica had submitted claims for services rendered by Mr. Nakouzi, had represented that Dr. Fica had personally provided those services, and had represented that the services had been rendered in a lawful and appropriate manner, even though both Dr. Fica and Mr. Nakouzi knew that this was not true. *Id.* ¶ 16. Among the overt acts charged in the Indictment are that, with the knowledge and consent of Dr. Fica, Mr. Nakouzi had: (1) held himself out to patients and others as "Dr. Nakouzi"; (2) rendered diagnoses of patients, examined patients and formulated treatment plans for patients; (3) conducted office visits with patients when no licensed physician was in the office; (4) falsely signed Dr. Fica's initials on medical records to make it appear as though Dr. Fica performed the service; and (5) signed Dr. Fica's initials on prescriptions and provided prescriptions to patients. *Id.* ¶¶ 18(b),(c),(e),(x),(y).

The nine substantive counts of the Indictment delineate nine separate individuals who had office visits at Dr. Fica's offices between 2000 and 2003 that were conducted in whole or substantial part by Mr. Nakouzi, even though the office visits were billed to health benefit programs as if Dr. Fica had personally rendered the services and as if the services were lawfully provided. *Id.*

**The DPH Investigation.**     Section 19a-14(11) of the Connecticut General Statutes charges the Connecticut Department of Public Health ("DPH") with "[c]onduct[ing] any necessary investigation and follow-up in connection with complaints regarding persons subject to regulation or licensing by the department."  In September 1998, an inspector from the DPH was conducting a review of the laboratory at Dr. Fica's office, and the inspector noticed that Mr. Nakouzi was in the office, and "had a white coat on and a stethoscope around his neck . . . and appeared to be doing dictation." DPH Investigative Report, dated February 11, 1999, Defendant Fica's Memorandum of Law in Support of his Motion to Suppress [doc. #23] Ex. 1, at 1 (the "DPH Report"). When the inspector asked if Mr. Nakouzi was an internist in the practice, Mr. Nakouzi "said something to the effect that he was a doctor." *Id.*   The investigator also obtained Mr. Nakouzi's business card, which had "M.D." listed after his name.  *Id.*   After checking with licensure and finding that Mr. Nakouzi was not a licensed physician, the investigator asked DPH to conduct an investigation "to rule out that respondent is not working as an unlicensed physician in Connecticut."  *Id.*

In response, DPH began an investigation of Mr. Nakouzi.  The sum total of investigative efforts appears to have consisted of an investigator making a single phone call to Dr. Fica's office on October 9, 1998, to try and make an appointment with Mr. Nakouzi, and a single spot inspection at Dr. Fica's office on January 27, 1999.  When the investigator called for an appointment, she was told that she would have to see Dr. Fica along with Mr. Nakouzi because Mr. Nakouzi "does not take

3

appointments alone." *Id*. at 2. When the investigator asked why, she was told that Mr. Nakouzi "has not gotten his boards yet." *Id*. (internal quotation marks omitted).  During the spot investigation, the investigator noted that Mr. Nakouzi's name was not posted on the office door or in the waiting room. The investigator met with Mr. Nakouzi, who reported that he "works as Dr. Fica's assistant" and "sees patients with Dr. Fica only.  He [Mr. Nakouzi] reiterated that he never sees patients alone. He does not prescribe medication." *Id*.  Mr. Nakouzi explained that he hoped to go into Dr. Fica's field of medicine, which is endocrinology, and that he hoped his experience with Dr. Fica would help him get accepted into a residency program. Mr. Nakouzi also told the investigator that he had a medical degree from St. George in Grenada and therefore was an M.D. *Id*.

On March 25, 1999, Kathleen Zarrella, Public Health Services Manager for DPH's Division of Health Systems Regulation, wrote a letter (the "DPH Letter") to Mr. Nakouzi.  Ms. Zarrella informed Mr. Nakouzi that DPH was responsible for handling petitions against regulated health professionals and that DPH had now concluded its investigation of Mr. Nakouzi.  Enclosed with the DPH Letter was a copy of the DPH Report, which recited the above-noted facts learned by the DPH investigator and included a memo from the individual who had precipitated the investigation, along with a copy of Mr. Nakouzi's business card and resume. Of significance to the pending motions, the DPH Letter stated that "[a]fter a thorough investigation the Department has concluded that there is an insufficient basis to proceed further with this matter and, therefore, the case has been closed." DPH Letter, dated March 25, 1999, Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23] Ex. 1.

**The Search Warrant.**   On January 29, 2003, the Federal Government sought and obtained a search warrant for the medical office of Dr. Fica in Waterbury.  The application for the warrant was

4

based upon the affidavit of a Special Agent of the Federal Bureau of Investigation. Affidavit of Ron W. Offutt, Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23] Ex. 2 (the "FBI Affidavit"). The FBI Affidavit (consisting of seventy numbered paragraphs in eighteen pages, and two attachments describing the premises to be searched and the items to be seized) provides general information about the investigation, Dr. Fica's practice, the provision of health care benefits, and billing for health care services. The Affidavit also describes what the agent claimed was a scheme by Dr. Fica and Mr. Nakouzi to defraud Medicare, Medicaid, and private insurers by "having an unlicensed medical practitioner provide services to [Dr. Fica's] patients [and] billing for services under [Dr. Fica's] provider number when [Dr. Fica] was out of town . . . " *Id.* ¶ 15.   In paragraphs 17-22 of the FBI Affidavit, the agent notes that the DPH had conducted an investigation in 1999 and accurately describes the facts learned during the investigation.  Notably, however, the agent never states that the DPH had closed its investigation and had informed Mr. Nakouzi in March 1999 that "after a thorough investigation the Department has concluded that there is an insufficient basis to proceed further with this matter." DPH Letter, dated March 25, 1999, Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23] Ex. 1.

The FBI Affidavit goes on to state that Dr. Fica had described Mr. Nakouzi to an insurer as a "Physician's Assistant," but that Mr. Nakouzi was not a licensed Physician's Assistant. FBI Affidavit, Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23] Ex. 2 ¶¶ 23-26.  The Affidavit also describes at some length the results of interviews with three former employees of Dr. Fica's office – Dr. Miguel Aquino, a licensed physician who worked in Dr. Fica's practice for approximately one year beginning December 1998; Pat Casey, a licensed registered  nurse who worked for the practice for about one year beginning October 2000; and Michelle Coley, a medical

transcriptionist who provided transcription services for Dr. Fica's practice in the 1990s and the year 2000. *Id*. ¶¶ 28-57.

The FBI Affidavit recites that according to Dr. Aquino, "Nakouzi's responsibilities in the practice differed little from Dr. Aquino's or Dr. Fica's" and "the impression in the office and amongst his patients was that [Mr. Nakouzi] was a 'doctor.' " *Id*. ¶ 28.  The Affidavit also states that Dr. Aquino recalled that "[w]hen Dr. Fica would go out of town, Nakouzi saw patients on a regular basis." *Id*.; *see also* ¶ 49.  The FBI Affidavit also recounts Ms. Casey's account that "Nakouzi would see patients listed under Fica's name on the [office] schedule," that "after Fica provided initial consultations to a patient, the patient's future visits would be assigned to one of the staff (Nakouzi, Casey, or Madden), and the patient would continue to treat with that staff member," that on a few occasions, "Dr. Fica would have no contact with the patient," and that Nakouzi had "signed Dr. Fica's name or initials on prescriptions." *Id*. ¶¶ 30-32.  The Affidavit also claims that Ms. Casey recalled that "when Dr. Fica was going out of town he would instruct the billing clerk to bill as though he were in the office" and that Ms. Casey believed that "services she provided to patients were billed [to health care plans] under Dr. Fica's provider number and name." *Id*. ¶¶ 50-51.

According to the FBI Affidavit, Ms. Coley recalled that patients and staff of Dr. Fica's practice referred to Mr. Nakouzi as "Dr. Nakouzi," and that on an average day Dr. Fica's office treated about ninety patients, with Dr. Fica seeing about twenty-five, and Mr. Nakouzi seeing about twenty. *Id*. ¶¶ 36-37.  On one occasion, Ms. Coley reportedly mentioned a back problem to Mr. Nakouzi, who prescribed valium for her, though Ms. Coley did not recall whether Mr. Nakouzi took the prescription to Dr. Fica to sign. *Id*. ¶ 39. According to Ms. Coley, Mr. Nazouki "saw patients on a regular basis." *Id*. ¶ 40.

6

The FBI Affidavit also states that "[o]ur investigation has developed information that Nakouzi continues to see patients for office visits and render medical services, as recently as this month," and that all claims submitted to insurance carriers are billed under Dr. Fica's provider number, indicating that Dr. Fica personally performed the service, even though some of those services were provided by Mr. Nakouzi. *Id*. ¶¶ 41-42.  The Affidavit quotes the certification that must be submitted on each Medicare claim, which attests that "the services shown on this form were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision," and also quotes Medicare's definition of the phrase "direct personal supervision," according to which "[t]he physician must be present in the office suite and immediately available to provide assistance and direction." *Id*. ¶¶ 43, 47.  According to the FBI Affidavit, Medicare reimburses for covered services provided by non-medical doctors at 85% of the rate for licensed practitioners, and when Dr. Fica was out of the office, his staff should have been billing for valid services using provider numbers other than Dr. Fica's. *Id*. ¶ 48.

In conclusion, the FBI Affidavit stated that claims for services rendered by Mr. Nakouzi were being billed under Dr. Fica's provider number in a manner that made it appear as if Dr. Fica personally rendered the services, or as if the services were properly provided by a licensed medical provider under Dr. Fica's immediate personal supervision, when neither of these circumstances were true. *Id*. ¶ 61.  "Second, and contrary to insurance carrier rules and regulations, on days when Dr. Fica is out of town he has allegedly instructed his billing staff to continue to bill using his provider number as though he were in the office.  Previous employees of Dr. Fica's have confirmed that when

he is not in the office patient visits continue as normal." *Id*. ¶ 62.[1]

Based on the FBI Affidavit, the Government sought approval for a search and seizure of Dr. Fica's medical and billing records, along with his computers. On January 29, 2003, Magistrate Judge William I. Garfinkel approved the request for a search warrant and the warrant was executed on January 30, 2003. The Indictment followed.

## II.

The information and documents obtained as a result of the search of Dr. Fica's offices on January 30, 2003, are the focus of Defendants' motion to suppress. Defendants argue that the FBI agent's failure in his affidavit to inform the Magistrate Judge of the result and conclusion of the DPH's 1999 investigation was reckless, and that the omission of this information from the FBI Affidavit requires suppression of the material seized from Dr. Fica's office. Defendants also seek a hearing on their motions to suppress. Finally, Defendants move to dismiss the Indictment against them on the basis of the doctrine of entrapment by estoppel. In particular, Defendants argue that because their alleged illegal conduct was previously approved by the DPH following its investigation, the Government is estopped as a matter of law from pursuing the present prosecution.

### A.   Defendants' Request for a *Franks* Hearing

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that the Fourth Amendment requires a hearing at a defendant's request when the defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard

---

[1] The FBI Affidavit also contained allegations regarding alleged fraudulent billing of thyroid and echocardiograms, ¶¶ 54-58, but at argument on Defendants' motions, the Government stated that it did not assert that those allegations alone would have provided probable cause to justify the search warrant.

8

for the truth, was included by the affiant in the warrant affidavit, and [] the allegedly false statement [wa]s necessary to the finding of probable cause." *Id*. at 155-56.  If, at the hearing, the defendant establishes the allegations of perjury or reckless disregard by a preponderance of the evidence, and, "with the affidavits's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," *id*., "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit," *id*. However, even in the face of specific allegations of a false statement or reckless disregard, if the court is satisfied that "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause," *id.* at 171-72, then "no hearing is required," *id*.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).  Because a presumption of validity attaches to an affidavit supporting a search warrant, "[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. It is not sufficient to allege negligence or innocent mistake. *Id*. Furthermore, "[e]very statement in a warrant affidavit does not have to be true." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (internal quotation marks omitted). Rather, to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that: (1)  the warrant affidavit contains a false statement or material omission that makes the affidavit misleading; (2)  the false statement or material omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (3) the false statement or material omission was integral or necessary to the judge's probable cause finding.  *See, e.g.*, *United States  v. Martin*,  426 F.3d 68, 73-74 (2d Cir. 2005);

9

*United States v. Singh*, 390 F.3d 168, 183 (2d Cir. 2004); *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003); *Canfield*, 212 F.3d at 717-18; *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

Defendants argue that they have satisfied the standard for obtaining a *Franks* hearing; the Government disagrees.  At argument on the issue, the Court inquired of Defendants' counsel what they hoped to elicit at a *Franks* hearing.  Defendants' counsel responded that the purpose of the hearing would be to establish the second requirement recited above – that is, that the FBI agent acted recklessly in omitting the results of the DPH investigation from his affidavit.  In response to the Court's inquiries, Defendants' counsel expressly represented to the Court that a *Franks* hearing was not necessary for this Court to determine whether, had they been disclosed to the Magistrate Judge, the results of the DPH's 1999 investigation would have undermined or eliminated probable cause. In particular, the Court asked counsel whether a *Franks* hearing would be needed if the Court concluded that the omission of the DPH's Letter was not integral or necessary to the probable cause finding, and Defendants' counsel responded that in that circumstance, a *Franks* hearing would not be necessary.

As discussed below, the Court is convinced that even when the omitted information regarding the conclusion of the DPH investigation is considered, the FBI Affidavit would still have supported a finding of probable cause, within the meaning of the Second Circuit law governing that inquiry. As a consequence, a *Franks* hearing is unnecessary, and this Court need not (and does not) decide whether the omission of the DPH Letter from the affidavit was made intentionally or recklessly.  *See Salameh*, 152 F.3d at 113 (if, after considering the omitted information, the affidavit nonetheless presents sufficient information to support a finding of probable cause, the district court need not

conduct a *Franks* hearing); *United States  v. Colkey*,  899 F.2d 297, 301 (4th Cir. 1990) ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing") (quoted with approval in *Awadallah*, 349 F.2d at 67-68); *United States v. Martinez*, 869 F. Supp. 202, 208-209 (S.D.N.Y. 1994) (because the affidavit was sufficient to establish probable cause without the omitted information, there was no reason to hold a *Franks* hearing).

### B.    Defendants' Motion to Suppress

As the Supreme Court held in *Franks*, the ultimate question in deciding whether to suppress the fruits of a search conducted pursuant to a warrant is whether, if the court disregards the false material in the warrant affidavit, the affidavit's remaining content is sufficient to establish probable cause.  *Franks*, 438 U.S. at 156.  Put another way, the "ultimate inquiry is whether, after putting aside erroneous information and material omissions,  there remain a residue of independent and lawful information sufficient to support probable cause." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted); *see also Awadallah*, 349 F.3d at 65 (same). Omissions from an affidavit are governed by the same rule as false statements, though instead of subtraction, a district court engages in a process of addition.  That is, a court should add the missing information to the affidavit and then determine whether the corrected affidavit contains sufficient information to support a finding of probable cause.  *See Canfield*, 21 F.3d at 718.

What, then, is required to support a finding of probable cause for a search warrant? The Second Circuit has held that a "judge's probable cause determination is not overly strict." *Martin*, 426 F.3d at 74.  Rather, probable cause requires only a "a *practical, common-sense* decision whether, given all the circumstances set forth in the affidavit . . ., including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability* that contraband or

evidence of *a* crime will be found in a particular place." *Id*. (emphasis in original) (internal quotations marks omitted).  Probable cause is not a rigid formula, but rather a "fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Only a fair probability of criminal conduct is required; a prima facie showing of criminal activity is not necessary. *Martin*, 426 F.3d at 74; *see also United States v. Leon*, 468 U.S. 897, 958 (1984) (probable cause is a "relaxed standard").  Moreover, " 'the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.' "  *Martin*, 426 F.3d at 87 (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).

Applying these standards, the Court has little difficulty in concluding that there was probable cause to support a search warrant even if the FBI Affidavit is corrected to include the fact that in March 1999 the DPH informed Mr. Nakouzi that after a thorough investigation, it had concluded that there was insufficient basis to continue its investigation.  The Court reaches this conclusion for several reasons.

First, it is important to note that the agent did include in his affidavit the exculpatory factual information from the DPH Report.  What the FBI Affidavit did not include was the conclusion of the DPH's allegedly "thorough investigation" and the fact that the DPH's conclusion had been communicated to Mr. Nakouzi.  But the DPH Letter is not the unqualified blessing of Dr. Fica's business practices that Defendants claim it to be.  The DPH Letter does not state that all past or future conduct of Mr. Nakouzi complied and would continue to comply with Connecticut law. Indeed, the DPH Letter does not even state that the conduct described in the DPH Report complied with Connecticut law, although that may be a fair inference.  Rather, the DPH Letter merely states

that, based upon the investigation conducted to that time, DPH had insufficient basis to proceed any further. That conclusion, reached in 1999, does not undermine the additional information, obtained at a later date, contained in the FBI Affidavit, or cast doubt on the existence of probable cause. *See Rivera*, 928 F.2d at 605; *Martinez*, 869 F. Supp. at 208-209. Indeed, as the Government argues, it is just as likely (if not more) that a judge assessing the conduct alleged by the former employees in the FBI Affidavit, along with the DPH Report and DPH Letter, would have concluded that Mr. Nakouzi had misled the DPH investigators in 1999 about the true nature of his activities.

Second, even if the DPH letter were the unqualified exculpation that Defendants claim it is, the FBI Affidavit describes conduct by Mr. Nakouzi and Dr. Fica that is very different from the conduct that the DPH evaluated in 1999. Therefore, the DPH's conclusion in its letter to Mr. Nakouzi would not cause a judge to conclude that the Government lacked probable cause to obtain a search warrant in 2003. According to the DPH Report, Mr. Nakouzi never saw patients alone, always saw patients along with Dr. Fica, and never prescribed medications. *See* Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23], Ex. 1 at 2. Little wonder, then, that the DPH, which apparently accepted Mr. Nakouzi's statements at face value, saw no reason to continue its investigation. For as the Government acknowledged at argument, if that is all that Mr. Nakouzi and Dr. Fica had ever done, it is unlikely that this case would have been filed.

But according to the FBI Affidavit, both Mr. Nakouzi and Dr. Fica engaged in more conduct than that investigated by DPH. Indeed, the FBI Affidavit describes conduct by Dr. Fica and Mr. Nakouzi that is completely at odds with the facts that Mr. Nakouzi related to the DPH investigator in 1999. Thus, the Affidavit alleges that Mr. Nakouzi – who was not licensed as a physician's assistant or nurse, let alone as a doctor – saw patients alone, treated and diagnosed those patients,

13

prescribed medications, and saw patients when Dr. Fica was out of town and thus not present in the office to supervise him.  *See, e.g.*, FBI Affidavit, Def. Fica's Mem. in Support of Mot. to Suppress [doc. #23], Ex. 2 ¶¶18(b),(c),(e),(x),(y). More importantly, unlike the DPH investigation, the FBI Affidavit focuses on health care fraud, and provides substantial information on the conduct of Dr. Fica and his billing practices, none of which was investigated by DPH or even mentioned in either the DPH Report or DPH Letter.  Thus, the FBI Affidavit alleges that Dr. Fica instructed his staff to use his provider number for billing purposes even when he was not present in the office, and that he billed for services provided by others in the office (not just Mr. Nakouzi but also Ms. Casey) as if Dr. Fica himself had performed the services.  *See, e.g.*, *id.* ¶¶ 61-62.

In this respect, this case is similar to *United States v. Singh*, 390 F.3d 168, 183 (2d Cir. 2004).  In *Singh*, the Second Circuit affirmed a district court's holding in a health care fraud case that an omission from a warrant affidavit was not critical to the probable cause determination. The omission was of a report opining that medications defendant had prescribed for nine patients were medically appropriate. The district court reached its conclusion that the omission was not critical to probable cause because the omitted report was limited to those nine patients and its author had not examined actual prescription records. *See id.* at 183-84.  So, too, in this case the DPH Letter, which did not examine Dr. Fica's billing practices and relied solely on Mr. Nakouzi's description of his own conduct, would not undermine the showing of probable cause made by the FBI Affidavit.

Third, the FBI Affidavit is based upon information that was not included in the DPH Report and that was not even available at the time the DPH Report was completed in 1999. The Affidavit contains detailed allegations from three former employees of Dr. Fica's office about the practices in his office, at least two of whom worked at Dr. Fica's office in years after the DPH completed its

investigation. These employees were in a position to observe Dr. Fica and Mr. Nakouzi on a regular basis and to know how they functioned with respect to patients and billing. The information provided to the FBI by these former employees, and recounted in the FBI Affidavit, strongly suggested that there was a fair probability that evidence of health care fraud would be found at Dr. Fica's offices and in his computers.  In short, even considering the DPH's Letter to Mr. Nakouzi and giving it the favorable interpretation that Defendants seek, "there remains a residue of independent and lawful information [in the affidavit] sufficient to support probable cause." *Awadallah*, 349 F.3d at 69 (internal quotation marks omitted).

In arguing that probable cause would be lacking if the DPH Letter had been considered, Defendants rely heavily on *United States v. Alvarez*, 127 F.3d 372 (5th Cir. 1997). There, the Fifth Circuit suppressed the fruits of a search warrant because the court concluded that a law enforcement officer's affidavit contained a false statement that was recklessly made and was necessary to the finding of probable cause. The affidavit supporting the warrant application in *Alvarez* stated that the defendant had "produced a video tape that visually depicts a child younger than 18 years of age . . . who is engaging in sexual conduct." *Id*. at 373.  In fact, the video tape depicted the minor child exposing her breasts for about a second. The affidavit never described the factual predicate for the conclusion that the child was "engaging in sexual conduct," and this omission was critical because the act of exposing her breasts did not qualify as sexual conduct under the Texas Penal Code, which required "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals." *Id*. at 374 n.1. As a consequence, the Fifth Circuit stated that "[i]n the final analysis, we simply cannot accept the premise that an officer with Rivera's qualifications could in good faith believe that . . . exposure of

a young girl's breasts amount[s] to a 'lewd exhibition of the genitals.'" *Id*. at 375.

As should be readily apparent, the facts of *Alvarez* are very different from those presented here. Unlike the affidavit in *Alvarez*, the FBI Affidavit does not simply contain the conclusory (and erroneous) statement of a single law enforcement officer that Defendants are engaged in criminal conduct, here health care fraud. Instead, the Affidavit contains a detailed description of Defendants' conduct, including the allegations of three former employees about the activities of both Dr. Fica and Mr. Nakouzi and instructions given by Dr. Fica to his office staff about billings. Furthermore, the conduct described does appear to constitute health care fraud. Therefore, *Alvarez* is no help to Defendants.[2]

Defendants' principal argument regarding the existence of probable cause is that if the Magistrate Judge had been aware of the DPH Letter to Mr. Nakouzi, the judge would have concluded that any prosecution of Defendants for their conduct was barred by the defense of entrapment by estoppel. *See* Def. Fica's Mem. in Support of Mot. to Dismiss [doc. #23] at 17 (the affiant's omission "prevented Magistrate Garfinkel from applying the law to the facts of the case"). As is discussed in the next section, the DPH's Letter does not "operate as an absolute bar," *id*. at 13, to the criminal prosecution of Defendants for health care fraud, and therefore, there would have been no reason for the Magistrate Judge to have reached that conclusion had he been aware of the DPH letter. Indeed, in the Court's view, it is highly unlikely that the DPH Letter would reasonably have alerted any judge to the possibility that such a defense would be asserted, let alone accepted as a matter of law.

However, even if the DPH Letter had alerted the judge to the possibility of an entrapment by

---

[2] For similar reasons, the Fifth Circuit's decision in *United States v. Namer*, 680 F.2d 1088 (5th Cir. 1982), is also distinguishable from the present case.

estoppel defense, the Second Circuit has explained on more than one occasion that the mere possibility of an innocent explanation consistent with the facts alleged does not negate the existence of probable cause. *See Martin*, 426 F.3d at 87; *Fama*, 758 F.2d at 838. As explained above, at the probable cause stage, a judge is not concerned with concepts of beyond a reasonable doubt, preponderance of the evidence, or even a prima facie case, but rather whether considering the affidavit in a common-sense and practical manner, there is a fair probability that evidence of a crime may be found at the location to be searched. *See Martin*, 426 F.3d at 74; *Singh*, 390 F.3d at 184. For the reasons explained above, the Court is more than satisfied that the FBI Affidavit met this standard, even when the Court considers the DPH Letter and the fact that Mr. Nakouzi had been informed in 1999 that the DPH had an insufficient basis to continue its investigation of him.

### C.  Defendants' Motion to Dismiss the Indictment

Finally, Defendants argue that the Indictment should be dismissed under Rule 12 of the *Federal Rules of Criminal Procedure* on the basis of the doctrine of entrapment by estoppel.  *See* Def. Fica's Mem. in Support of Mot. to Dismiss [doc. #35-2] at 1; Def. Nakouzi's Mot. to Adopt Motions of Co-Def. [doc. #41]. In particular, Defendants argue that "because the alleged illegal conduct was previously approved by the Connecticut Department of Public Health following a prior investigation" the Government is estopped as a matter of law from pursuing the present prosecution. *Id*. Unlike on their motion to suppress, Defendants do not seek a hearing on their motion to dismiss. Instead, they rely solely on the 1999 DPH Letter to Mr. Nakouzi stating that "[a]fter a thorough investigation the Department has concluded that there is an insufficient basis to proceed further with this matter and, therefore, the case has been closed." DPH Letter, dated March 25, 1999, Def. Fica's Mem. in Support of his Mot. to Suppress [doc. #23] Ex. 1.

17

The defense of entrapment by estoppel is well settled in the Supreme Court and the Second Circuit. *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 559, 571 (1965). *United States v. Abcasis*, 45 F.3d 39 (2d Cir. 1995), is the foundational case discussing the defense in the Second Circuit, and the opinion cites to the numerous other circuits that have embraced it. *Id*. at 43. According to the Second Circuit, "[t]his defense arises where a government agent authorizes a defendant 'to engage in otherwise criminal conduct . . . and the defendant relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief that he has in fact been authorized to do so.' " *United States v. Gil*, 297 F.3d 93, 107 (2d Cir. 2002) (quoting *Abcasis*, 45 F.3d at 43). The defense "does not depend solely on absence of criminal intent. Nor is it limited to the circumstance of actual authorization." *Abcasis*, 45 F.3d at 44. Rather, "[i]t focuses on the *conduct of the government* leading the defendant to believe reasonably that he was authorized to do the act forbidden by the law. The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized." *Id*. This focus on unfairness arises from the circumstances that gave birth to entrapment by estoppel. For, in its seminal decision recognizing the defense, the Supreme Court overturned a conviction for picketing near a courthouse when city officials had told the defendant to confine his demonstration to the west sidewalk, and the defendant had done so. The Court explained its rationale as follows:

> [U]nder all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the State – *convicting a citizen for exercising a privilege which the State had clearly told him was available to him*.'

*Cox*, 379 U.S. at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959)) (emphasis added).

Although the defense of entrapment by estoppel is well recognized, Defendants are not

entitled to dismissal of the Indictment on the basis of that defense. Rule 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine *without a trial of the general issue*." Fed. R. Crim. P. 12(b)(2) (emphasis added). As the Second Circuit has explained, "[t]he general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged." *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995). Ordinarily, therefore, a defendant is not entitled to raise in a pretrial motion a defense to liability for the crimes charged, for "resolution of that question requires a trial of the general issue." *Id*. Moreover, to the extent that Defendants do not claim a defense but rather challenge the sufficiency of evidence of their criminal intent, that is also not a proper matter for a pretrial motion to dismiss an indictment "[u]nless the Government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *United States v. Alfonso,* 143 F.3d 772, 777 (2d Cir. 1998) (sufficiency of evidence as to jurisdictional element of Hobb's Act indictment "not appropriately addressed on a pretrial motion to dismiss an indictment"); *see also United States v. Aleman*, 286 F.3d 86, 92 (2d Cir. 2002) (district court should avoid deciding on a pretrial motion issues relating to a defendant's criminal liability).

Here, of course, the Government has made no such proffer. All that is before the Court is the Indictment and the DPH Letter, neither of which permits this Court to rule *as a matter of law* that prosecution of Defendants for health care fraud is barred by the doctrine of entrapment by estoppel. Defendants' defense simply raises too many question of fact. For example, to be successful on a defense of entrapment by estoppel, a defendant must show that his reliance on the government's assurances was "reasonable." And "for a defendant's reliance to be reasonable, the jury must conclude that a person sincerely desirous of obeying the law would have accepted the information

19

as true and would not have been put on notice to make further inquiries." *Abcasis*, 45 F.3d at 44

(internal quotation marks omitted); *see also United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994).

It is apparent, however, that the Court cannot possibly conclude from the DPH Letter alone that

Defendants' reliance on it was reasonable as a matter of law. For one thing, the Court has no

evidence whether the information Mr. Nakouzi gave the DPH was accurate. Nor does the Court have

any evidence of what the DPH intended to convey by the phrase "insufficient basis to proceed

further," or of how Defendants construed and applied the DPH Letter at the time (Defendants having

submitted no affidavit). Presumably, evidence of these matters will be presented at trial, which is

precisely where a fact-intensive defense such as entrapment by estoppel should be resolved. *See*

*Mathews v. United* States, 485 U.S. 58, 63 (1988) ("The question of entrapment is generally one for

the jury, rather than for the court"); *United States v. Fadel*, 844 F.2d 1425, 1430 (10th Cir. 1988)

("The vast majority of courts which have considered the issue have *not* favored pretrial resolution

of entrapment defense motions") (emphasis in original); *United States v. Labate*, No. S100CR.632,

2001 WL 533714, at *9 (S.D.N.Y. May 18, 2001) (question of entrapment is generally one for the

jury not the court).

    To prevail on a defense of entrapment by estoppel, "[the] defendant's conduct must [also]

remain within the general scope of the . . . assurance of authorization; this defense will not support

a claim of an open-ended license to commit crimes in the expectation of receiving subsequent

authorization." *Abcasis*, 45 F.3d at 44. As yet, the Court has no evidence that Dr. Fica's billing

practices fell within the "general scope" of the DPH's assurance or that Defendants continued after

1999 to conform their conduct to the representations that Mr. Nazouki made to the DPH investigator.

Indeed, if the evidence from former employees recited in the FBI Affidavit is to be believed,

20

Defendants' conduct was not as described to the DPH, and if that is so, Defendants certainly would not be entitled to prevail on the defense of entrapment by estoppel. *See id.*; *see also Singh*, 390 F.3d at 187-89 (affirming conviction for health care fraud in billing practices). In short, in the circumstances of this case, the defense asserted by Defendants is not something this Court can or should resolve "without a trial of the general issue." Fed. R. Crim. P. 12(b)(2); *see also United States v. Knox*, 396 U.S. 77, 83 n.7 (1969) (evidentiary issues relating to possible defenses "should not be determined" by a Rule 12 motion); *Alfonso*, 143 F.3d at 777 ("When a question of federal subject matter jurisdiction is intermeshed with questions going to the merits [of the prosecution], the issue should be determined at trial . . . ."); *United States v. Williams*, 644 F.2d 950, 952-53 (2d Cir. 1981) ("[I]t would be impractical and unwise to attempt pretrial resolution of [defendant's] due process claims, because they are substantially founded upon and intertwined with the evidence to be presented at trial.").

The Court also has substantial doubts that an entrapment by estoppel defense is even available under the facts of this case. While the Court need not finally resolve those concerns at this time, they are worth noting because they certainly would prevent the Court from ruling, as Defendants request, that the prosecution of Defendants was barred *as a matter of law*. For example, in *United States v. George*, 386 F.3d 383 (2d Cir. 2004), the Second Circuit stated that "[e]ntrapment by estoppel is a defense applicable only to crimes that do not require fraudulent intent, because the establishment of entrapment by estoppel would also negate the intent requirement of such crimes." *Id.* at 400. Thus, in the Second Circuit, the entrapment by estoppel defense is inapplicable to a charge of mail fraud. *See id.*; *Gil*, 297 F.3d at 107 (affirming district court's refusal to charge the jury on entrapment by estoppel where the defendant was charged with mail fraud). Like a charge of mail

fraud, the health care fraud charged in the Indictment requires a showing of fraudulent intent. *See Singh*, 390 F.3d at 187-89 (rejecting challenge to the sufficiency of the evidence of intent to defraud under 18 U.S.C. § 1347 in part because a rational jury could not "find ambiguities sufficient to negate fraudulent intent"). Thus, under *George* and *Gil*, there is a substantial question whether Defendants' entrapment by estoppel defense is even applicable to such charges.

In addition, it is not at all clear in the circumstances of this case that any representations made by a state agency such as DPH would estop the Federal Government from pursuing federal charges of health care fraud. There is no evidence that the DPH was acting as the Government's agent when DPH informed Defendants that its investigation was concluded. If, as the Second Circuit has repeatedly stated, the entrapment by estoppel defense is fundamentally concerned with the fairness of allowing a government to convict a citizen for engaging in conduct that the government itself told the defendant she could engage in, it is far from clear that this principle of fairness is implicated by the DPH's statements to Mr. Nakouzi about the status of a state, rather than federal, investigation. In this regard, the Court notes that in *Gil*, the Second Circuit held that the defendant "could not have reasonably believed that [state officials] were government officials that had 'authority to bind the federal government to an erroneous interpretation of federal law.' " *Gil*, 297 F.3d at 107 (quoting *United States v. Ormsby*, 252 F.3d 844, 851 (6th Cir. 2001)). As stated previously, the Court need not resolve these issues at this time. It suffices to say that there are substantial questions as to whether the Federal Government should be estopped from prosecuting Defendants for violating federal law on the basis of representations made by a state agency, and those questions prevent the Court from dismissing the Indictment on Defendants' pretrial motion. Of course, even if the defense of entrapment by estoppel were not available to Defendants, the DPH Letter might still bear on

22

Defendants' intent, but, as indicated, that is an issue for the jury and not for this Court on a pretrial motion.  *See Gil*, 297 F.3d at 107.

The Sixth Circuit's decision in *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992), on which Defendants principally rely, does not dictate a different result.  In *Levin*, the Sixth Circuit affirmed a district court's dismissal of most of the counts of a Medicare fraud prosecution that was founded on a "sales inducement campaign" that had been explicitly approved "in a series of official letters" from "reimbursements specialists" at the Health Care Financing Agency ("HCFA"), the *federal* agency that oversees Medicare. *Id*. at 465. In one letter, approving the sales inducement program, HCFA stated: "[W]e believe that we have an obligation to the public to provide our opinion as to the propriety of certain charging arrangements . . . as long as the inducement is related to the item, and as long as there is no additional charge to the beneficiary of HCFA for the item, device or service, *then there is no issue of reimbursement abuse*." *Id.* at 465 (original emphasis omitted and emphasis added). Although defendants did not themselves seek advance approval from HCFA for their sales campaign, HCFA's approval of such campaigns "was circulated throughout the targeted professional medical community" and the campaign for which the defendants were indicted was identical to those which HCFA had approved as not violating Medicare reimbursement rules.  *Id*.

The Sixth Circuit held that the pretrial dismissal of most of the indictment on a Rule 12 motion was proper even though issues such as entrapment by estoppel and criminal intent ordinarily "involve factual determinations" that prevent such a disposition because in *Levin* there was no dispute about the nature of defendants' sales inducement campaign or its compliance with HCFA's official approval letters, so the case "fail[ed] to present that obstacle." *Id*. at 468; *see also id*. at 466, 469, 470 (referring on each occasion to "*undisputed extrinsic evidence*") (emphasis in original).

23

Thus, the Sixth Circuit declared:

> From the undisputed operative facts it is apparent that (1) HCFA and its duly designated representatives declared the sales promotion program, which was the predicate for the indictment, to be legal; (2) the [defendants] relied upon HCFA's announcement; (3) the defendants' reliance was reasonable; and (4) prosecution for violation of the controversial counts of the indictment would be unfair.

*Levin*, 973 F.2d at 468.

This case is very different from *Levin*.  First, the court in *Levin* repeatedly emphasized that all operative facts were "undisputed." Not so here. As noted previously, there are numerous disputed facts relating to, among other issues, the scope of DPH's alleged "assurances" to Defendants, the accuracy of the information Mr. Nakouzi provided to DPH in 1999, the authority of DPH to "bind" the Federal Government, the reasonableness of Defendants' reliance on the DPH Letter, and the nature of Defendants' conduct and its conformance with whatever assurances DPH gave Defendants. While *Levin* can be seen as a case where "the Government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," *Alfonso,* 143 F.3d at 777, that is not the situation presented here.

Second, the facts of *Levin* are quite different from those alleged by the Government in this case. In *Levin*, HCFA, the arm of the Federal Government overseeing Medicare, had issued official letters sanctioning a certain type of sales inducement campaign. Here, by contrast, no federal agency approved of Defendants' billing practices, and the DPH Letter to Mr. Nakouzi is not the explicit official sanction that was presented in *Levin*. Moreover, it was undisputed in *Levin* that the defendants' conduct was identical to that which HCFA had approved, whereas in this case, the Government alleges that Defendants engaged in conduct that is vastly different from that on which DPH based its decision to discontinue its investigation in 1999. For all of these reasons, the Sixth

Circuit's decision in *Levin* does not alter this Court's decision to reject Defendants' pretrial request to dismiss the Indictment in this case.[3]

### III.

For the foregoing reasons, the Court DENIES Defendants' Motion to Suppress and for a *Franks* hearing [docs. ##21, 22].  The Court also DENIES Defendants' Motion to Dismiss [doc. #35].

IT IS SO ORDERED.

/s/_____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>November 30, 2005.</u>**

---

[3]  It is also worth noting that the Sixth Circuit in *Levin* is unclear about the precise basis of its decision. At times, the court appears to invoke the defense of entrapment by estoppel. *See, e.g.*, *Levin*, 973 F.2d at 468 ("[T]he criminal doctrine of entrapment by estoppel [] is based upon fundamental notions of fairness embodied in the Due Process Clause . . . ."); *id*. ("[P]rosecution for violation of the controversial counts of the indictment would be unfair").  At other points, however, the court focuses on criminal intent.  Thus, the Sixth Circuit takes note of the fact that the district court had held "that the government cannot as a matter of law establish criminal intent beyond a reasonable doubt."  *Id*. at 469.  And in its penultimate paragraph, the court affirms the district court's "findings of fact" that "as a matter of law . . .  the government could not prove the required element of intent necessary to support a conviction."  *Id*. at 470.